# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 26, 2010 Session

## SHIRLEY ANN ATKINSON, ADMINISTRATOR OF THE ESTATE OF ROBERT LEE PATTEE, JR., DECEASED v. STATE OF TENNESSEE

### Direct Appeal from the Tennessee Claims Commission
No. D20400245      Stephanie R. Reevers, Commissioner

---

### No. M2009-02587-COA-R3-CV - Filed July 9, 2010

---

This is an appeal from the Tennessee Claims Commission. The claimant/appellant alleged that state employees or their agents negligently caused the death of her fiancé, who committed suicide while incarcerated at the Lois M. DeBerry Special Needs Facility in Nashville, Tennessee. The Commission determined the claimant was not entitled to recover because she failed to produce expert testimony to establish the standards of care by which to judge the conduct of the prison officials and mental health professionals allegedly responsible for the care, custody, and control of the deceased. Because the Commission correctly determined that the claimant is unable to prove a breach of duty without expert evidence to establish the applicable standards of care, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Claims Commission Affirmed and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S. and HOLLY M. KIRBY, J., joined.

David L. Raybin and Sarah Richter Perky, Nashville, Tennessee, for the appellant, Shirley Ann Atkinson.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Mark A. Hudson, Senior Counsel, for the appellee, State of Tennessee.

**OPINION**

**I. Background and Procedural History**

This appeal concerns the suicide death of Robert Lee Pattee Jr., a prisoner who was serving a life sentence at the Lois M. DeBerry Special Needs Facility ("DeBerry") in Nashville, Tennessee. Mr. Pattee was initially placed at DeBerry, a prison with medical and mental health facilities, after he attempted suicide while awaiting trial on first degree murder charges. Following his conviction, Mr. Pattee was permanently assigned to DeBerry, where a team of mental health professionals, nurses, and prison officials ensured that he received regular treatment to address his mental health issues, which included anxiety and depression.[1] Over the next few years, Mr. Pattee had a fairly unremarkable course clinically and progressed from an initial placement in Unit 7C, an acute psychiatric unit, to Unit 6B, an open unit in which inmates held jobs and dined in the cafeteria.

On August 9, 2002, Mr. Pattee was transferred from Unit 6B to Unit 7B, a restricted unit for chronically depressed inmates, in order to resolve a growing security concern arising out of his "close" relationship with correctional officer Mary Hilla. Although not determined to be "inappropriate," the relationship between Mr. Pattee and Ms. Hilla gave the appearance to some that Ms. Hilla was protecting or favoring Mr. Pattee, which caused dissension in the unit.[2] Eventually, a rift developed and an "us versus them" mentality emerged, with inmates choosing sides between Ms. Hilla and the rest of the staff. Prison officials considered transferring Ms. Hilla to Unit 5 to resolve the situation, but the treatment team ultimately recommended Mr. Pattee's transfer to another unit. Within just one week of his transfer to Unit 7B, Mr. Pattee committed suicide, hanging himself from an air vent with his shoe laces.

Mr. Pattee's fiancé, Sherry Ann Atkinson, filed this wrongful death claim with the Division of Claims Administration, which transferred her claim to the Tennessee Claims Commission ("Commission").[3] *See* Tenn. Code Ann. § 9-8-402(c) (Supp. 2009). She alleged in her complaint that the negligence of state employees charged with the care, custody, and control of Mr. Pattee was the proximate cause of his death. She contended that state administrative personnel, employees, and other state agents negligently failed to provide reasonably necessary medical care to Mr. Pattee so as to prevent his suicide; failed to timely and reasonably respond to clear signs of potential suicide;

---

[1] Mr. Pattee's treatment team appears to have at various times consisted of a psychiatrist, a psychologist, a medical nurse, a psychological social worker, a nurse practitioner, and a security officer.

[2] Jason Woodall, a special agent in charge of the investigation of Mr. Pattee's death for the Internal Affairs Division of the Tennessee Department of Correction ("TDOC"), found insufficient evidence to sustain a finding that Mr. Pattee and Ms. Hilla had formed an "inappropriate relationship," which he defined to include either a romantic or sexual relationship.

[3] Ms. Atkinson filed this claim as the administrator of Mr. Pattee's estate. *See* Tenn. Code Ann. § 20-5-106(a) (2009).

and neglected to take necessary precautions regarding Mr. Pattee's safety and security, including placing Mr. Pattee on suicide watch following his transfer. Her complaint requested a fair and reasonable amount of compensatory damages not to exceed the statutory limit of $300,000. *See* Tenn. Code Ann. § 9-8-307(e) (Supp. 2009). The State of Tennessee ("State") filed an answer denying Ms. Atkinson's substantive allegations and setting forth several defenses, including its contention that no act or omission of a state employee was the proximate cause of the alleged harm to Mr. Pattee.

At the subsequent hearing of her claim, Ms. Atkinson offered the fact and expert testimony of nurse Mary Griffis-Parrish as the principal proof in support of her position. Ms. Griffis-Parrish, in her capacity as an adult psychiatric nurse, made rounds on all of the units at DeBerry, prepared reports on each patient every thirty days, conducted face-to-face visits with each patient every ninety days, met with patients individually, managed problems with medication, and attended some meetings of the prison treatment team. She testified that Mr. Pattee's transfer caused a noticeable change in his behavior and that he "decompensated," becoming severely depressed and suicidal. She specifically attributed this change to Mr. Pattee's transfer from Unit 6 to Unit 7 and testified that the warning signs would have been noticeable to any person with a mental health background.[4] Ms. Griffis-Parrish reported her concerns to the treatment team, but she was ultimately in the minority.[5] After consultation, the treatment team reached a consensus that Mr. Pattee was not at an increased risk of suicide and that additional suicide precautions were not required. Importantly, the psychiatrist with authority to place Mr. Pattee on suicide watch, Dr. Casey Arney, agreed that it was unnecessary to implement additional suicide precautions.[6]

---

[4]The transfer to Unit 7B carried with it several consequences for Mr. Pattee; he was removed from his position as a clerk, separated from Ms. Hilla, and placed in a cell where he was "locked up all the time."

[5]Although expressed to the treatment team, Ms. Griffis-Parrish's concern was never documented. With regard to her decision to not document Mr. Pattee's suicide risk, she stated:

> I'm careful about what I document for a lot of reasons. And a lot of times in my -- in my documentation, you have to read it closely and there's more than what I'm actually saying because I'm trying to say something without actually saying it.
>
> Once I document this -- that I think this man is a high risk suicide, I am legally responsible at that point to do something. I'm going to be liable if I say in a document that he is suicidal. So that was why I did not do that. Because there was nothing that I could do. So why document that? It was just going to cause a lot of trouble for a lot of people.

The Commission noted that "[Ms.] Griffis-Parrish's testimony that she did not bother to chart this obviously important assessment because she believed it would make her legally responsible to act is baffling."

[6]The testimony at the hearing suggested that only a physician or psychiatrist could order suicide precautions. Ms. Griffis-Parrish acknowledged that she had no authority to place Mr. Pattee on suicide watch. In her words, she "was a glorified pencil pusher . . . . [with] no autonomy and no power."

At the hearing, Ms. Griffis-Parrish testified that something more "should have been done" to prevent Mr. Pattee's death and that "[i]t would be indicated" that putting Mr. Pattee on suicide watch would have been *within* the realistic, acceptable standard of care. Ms. Griffis-Parrish, however, did not specifically testify as to the standards of care members of the treatment team owed to Mr. Pattee, either from the perspective of the medical professionals or the prison officials. She did not testify, for example, about the standard of care Dr. Arney, as a psychiatrist with authority to order suicide precautions, owed to Mr. Pattee. Although she indicated that prison officials also could have recommended suicide precautions, Ms. Griffis-Parrish did not outline the policies and procedures that governed the care and control of inmates at DeBerry, address the reasonableness of these policies and procedures, or identify any conduct on behalf of the TDOC's employees that fell below the acceptable standard of care.[7] When asked whether there was something more the TDOC or the treatment team could have done to prevent Mr. Pattee's suicide, she vaguely responded:

> I -- it's better to be safe than sorry. Yes, they could -- but hindsight is 20/20. You could look back and say they should have taken it more seriously. They should have had him on suicide watch. They should have seen him more frequently, but -- I mean, practically, yes, looking back, there was a lot of things a lot of people could have done differently.

But Ms. Griffis-Parrish, who was the only witness tendered as an expert, never specifically defined the applicable standards of care with respect to the individuals involved in the decision not to place Mr. Pattee on suicide precautions, never outlined what options were available to these individuals, and never testified that these individuals exhibited unreasonable conduct under the facts.

It was this shortcoming in Ms. Atkinson's case—the failure to produce any expert testimony on the standards of care—that the Commission primarily found controlling. In a lengthy and detailed judgment accounting for Mr. Pattee's prior suicide attempt, extended history of treatment at DeBerry, and the specific facts surrounding his transfer; the Commission held that Ms. Atkinson failed to proved the essential elements of her claim. The judgment stated, in pertinent part:

> Although Ms. Griffis-Parrish testified that in her opinion Mr. Pattee should have been placed on suicide precautions, her testimony fails to set forth the standard of care, either for the correctional officials responsible for his incarceration or for the medical staff responsible for his treatment, by which the reasonableness of their actions can be judged.

> Ms. Griffis-Parrish is not a correctional officer and there was no showing made that she had knowledge or training with respect to correctional practices or

---

[7]Ms. Griffis-Parrish testified that the first precaution for inmates who are at a high risk of suicide is around-the-clock suicide monitoring, which requires prison officers to clear the inmate's cell of potentially harmful items, remove the inmate's shoelaces and belts, and observe the inmate every fifteen minutes. This is the extent of her testimony regarding the potential responses to Mr. Pattee's perceived risk for suicide.

-4-

procedures relative to the protection of inmates from self-injury. To the extent that Griffis-Parrish's testimony might be relevant to the duty owed Pattee by the mental health professionals outside the nursing field, there was no showing that she was qualified to render an opinion as to the care and treatment that they provided.

This is not a case in which the decedent's depression went unnoticed and untreated. Mr. Pattee had been under continuous treatment for depression for the entirety of his incarceration in the TDOC, a period of more than three years. Ms. Atkinson does not claim and the proof did not show that Pattee should have been on suicide watch for the entire period of his incarceration. The questions [sic] raised here is whether it should have been foreseen that Pattee's transfer back to unit 7, where he had lived for approximately two years, would pose an imminent risk of suicide. Such a determination, the Commission finds, is outside the common knowledge and experience of laypeople and requires expert proof that Ms. Atkinson did not provide.

The Commission further held that the State could not be held liable under a theory of vicarious liability for the alleged negligence of Ms. Griffis-Parrish and Dr. Arney, who were employed by a private vendor that contracted with the State to provide mental health services to inmates.[8] As a result, the Commission concluded that Ms. Atkinson failed to satisfy her burden of providing competent evidence to show that state employees failed to take reasonable action to protect Mr. Pattee from the risk of self-inflicted injury. Ms. Atkinson timely appealed.

## II. Issue Presented

Ms. Atkinson presents the following issues, as we perceive them, for our review:

(1)     whether the Commission erred when it excluded instant message and electronic mail correspondence between Ms. Hilla and Ms. Atkinson;

(2)     whether the Commission erred when it determined Mrs. Griffis-Parrish was not competent to testify about the TDOC's suicide prevention policies and procedures or the reasonableness of the treatment team's decision not to implement heightened suicide precautions for Mr. Pattee;

(3)     whether the Commission erred in entering judgment for the State because the treatment team knew or should have known that Mr. Pattee was at risk for suicide and the employees and agents responsible for his care, custody, and control failed to act reasonably to protect the prisoner.

---

[8]Because we affirm the Commission's ruling that Ms. Atkinson did not provide the requisite expert testimony to establish her negligence claim, we need not reach the question of whether Ms. Griffis-Parrish and Dr. Arney should be considered "employees" of the State.

The dispositive issue in this appeal, however, is whether Ms. Atkinson provided competent testimony to establish the essential elements of her claim for negligence.

## III. Standard of Review

Except where otherwise provided, "[t]he decisions of the individual commissioners or, when rendered, decisions of the entire commission regarding claims on the regular docket may be appealed to the Tennessee court of appeals pursuant to the same rules of appellate procedure which govern interlocutory appeals and appeals from final judgments in trial court civil actions." Tenn. Code Ann. § 9-8-403(a)(1) (Supp. 2009). Accordingly, we review the Commission's findings of fact and conclusions of law pursuant to Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Bowman v. State*, 206 S.W.3d 467, 472 (Tenn. Ct. App. 2006) (citation omitted). The Commission's factual findings receive a presumption of correctness and will not be overturned unless the evidence preponderates to the contrary. *Id.* (citing *Beare Co. v. State*, 814 S.W.2d 715, 717 (Tenn. 1991); *Dobson v. State*, 23 S.W.3d 324, 328-29 (Tenn. Ct. App. 1999); *Sanders v. State*, 783 S.W.2d 948, 951 (Tenn. Ct. App. 1989)). The Commission's legal conclusions are reviewed *de novo* with no presumption of correctness. *Id.* (citing *Turner v. State*, 184 S.W.3d 701, 704 (Tenn. Ct. App. 2005); *Crew One Productions, Inc. v. State*, 149 S.W.3d 89, 92 (Tenn. Ct. App. 2004); *Belcher v. State*, No. E2003-00642-COA-R3-CV, 2003 WL 22794479, at *4 (Tenn. Ct. App. Nov. 25, 2003)).

## IV. Analysis

The principal question before this Court is whether Ms. Atkinson, as the claimant, has established the essential elements of her negligence claim. The Commission is vested with exclusive jurisdiction to determine monetary claims against the State based on the alleged negligent acts or omissions of state employees charged with the care, custody, and control of persons. Tenn. Code Ann. § 9-8-307(a)(1)(E). Tennessee Code Annotated section 9-8-307(c) provides that the State's liability for negligence "shall be based on the traditional tort concepts of duty and the reasonably prudent person's standard of care." Tenn. Code Ann. § 9-8-307(c) (Supp. 2009). Under traditional tort concepts, a plaintiff in a negligence action must prove the following essential elements of the claim: duty, breach of duty, causation in fact, proximate causation, and damages. *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). In order to establish a breach of duty, a plaintiff must demonstrate "conduct by the defendant falling below the standard of care." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008) (citing *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 771 (Tenn. 2006); *Draper v. Westerfield*, 181 S.W.3d 283, 290 (Tenn. 2005)).

Under certain circumstances, the suicide death of an inmate can give rise to a compensable claim for negligence. "Prison officials have a duty to exercise ordinary and reasonable care for the protection of the persons in their custody." *Cockrum v. State*, 843 S.W.2d 433, 436 (Tenn. Ct. App. 1992) (citing *Kane v. State*, 1989 WL 136963, at *2 (Tenn. Ct. App. Nov. 15, 1989); *Langley v. Metro. Gov't*, 1988 WL 123001, at *5 (Tenn. Ct. App. Nov. 18, 1988)), *perm. app. denied* (Tenn. Dec. 7, 1992)). "The scope of this duty does not generally extend to protecting prisoners from self-inflicted injury or death." *Id.* (citing *Pretty on Top v. Hardin*, 597 P.2d 58, 60-61 (Mont. 1979);

*Delasky v. Village of Hinsdale*, 441 N.E.2d 367, 370-71 (Ill. App. Ct. 1982); *Lucas v. City of Long Beach*, 131 Cal. Rptr. 470, 474 (Cal. Ct. App. 1976)). "However, it can be expanded to include self-inflicted injury or death when the prison officials know or should know that the prisoner might harm himself or herself." *Id.* (citing *Mack v. Knox County*, 1989 WL 105653, at \*2 (Tenn. Ct. App. Sept. 13, 1989), *perm. app. denied* (Tenn. Jan. 2, 1990); *Kane*, 1989 WL 136963, at \*5).

Nevertheless, it is not enough simply to establish that prison officials knew or should have known that a prisoner was at risk for self harm; a plaintiff must also establish a breach of the resulting duty. As this Court has recognized, "[p]rison officials are not insurers of a prisoner's safety." *Id.* at 438 (citing *Figueroa v. State*, 604 P.2d 1198, 1205 (Haw. 1979); *Hardin*, 597 P.2d at 60-61). "Their conduct must only be reasonably commensurate with the inmate's known condition." *Id.* (citing *Stokes v. Leung*, 651 S.W.2d 704, 708 (Tenn. Ct. App. 1982)). "Except in the most obvious cases, whether the prison officials acted reasonably to protect a prisoner's safety requires expert proof or other supporting evidence." *Id.* (citing *Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C. 1981)). If the conduct of prison staff is not clearly improper, expert proof delineating the precise scope of the staff's duty and evaluating the adequacy of the staff's conduct is essential; the claimant cannot recover without it. *Id.*

This Court articulated and applied these principles in *Cockrum v. State*, 843 S.W.2d 433, 436 (Tenn. Ct. App. 1992), *perm. app. denied* (Tenn. Dec. 7, 1992), another case involving the suicide of an inmate at DeBerry. The prisoner in *Cockrum*, Leona Cockrum, was sentenced to life imprisonment and soon thereafter transferred to DeBerry because of "'depression and suicidal thoughts.'" *Id.* at 434-35. While at DeBerry, Ms. Cockrum continued to exhibit a significant need for mental health treatment. She remained withdrawn and asocial; consistently complained of depression, nervousness, insomnia, and hopelessness; repeatedly inflicted physical injury to herself; actively discussed committing suicide; and eventually attempted suicide. *Id.* As a result of her actions, Deberry's staff more than once placed Ms. Cockrum on suicide precautions. *Id.*

In an attempt to assist Ms. Cockrum, one of the counselors entered into a "mental health contract" with her. *Id.* This contract required Ms. Cockrum to attend counseling and therapy, become more involved in prison life, and discontinue her self-destructive behavior. *Id.* Adherence to this contract allowed Ms. Cockrum an opportunity to speak with her husband via telephone once a month. *Id.* Later, an attempt was made to arrange a face-to-face visit between Ms. Cockrum and her husband as part of her ongoing therapy. *Id.* The visit, however, was not immediately approved, leading Ms. Cockrum to quit her individual counseling sessions and to inflict injury to herself. *Id.* Ms. Cockrum, who was already under increased observation, became enraged when she was informed that she would no longer be able to telephone her husband because she violated her mental health contract. *Id.* Nevertheless, Ms. Cockrum calmed after a few days and prison officials removed her from increased observation status. *Id.* Thereafter, members of DeBerry's staff conducted a meeting to review her mental health status and to determine her treatment options. *Id.* When Ms. Cockrum refused further treatment, it was recommended that she be transferred back to the general population at the women's prison. *Id.* Just three days later, Ms. Cockrum committed suicide by overdose. *Id.* at 436.

Ms. Cockrum's husband filed a claim with the Commission alleging that the State's negligent supervision caused the untimely death of his wife. *Id.* at 434. This Court acknowledged on appeal that DeBerry's staff "knew or should have known that discontinuing her telephone calls and transferring her to the women's prison could have prompted Ms. Cockrum to attempt to harm herself in retaliation." *Id.* at 437. Accordingly, we agreed that DeBerry's staff had a duty to take reasonable precautions to prevent Ms. Cockrum from injuring herself. *Id.* We nonetheless held that her husband could not recover because he failed to provide expert evidence to establish the applicable standard of care:

> We have pieced together from the record that DeBerry's procedures call for heightened precautions whenever the treatment staff determined that additional precautions were necessary in order to protect the inmate from self-inflicted injury. These precautions included increased observation, cell searches, increased restraints, increased medication, removal of potentially harmful objects, and the use of paper clothing. What the record lacks is any proof concerning the criteria for determining when these precautions should be used or concerning whether the staff acted unreasonably by not imposing any or all of these restraints after [the date on which prison officials notified Ms. Cockrum of her potential transfer].
>
> . . . .
>
> The DeBerry staff's conduct in this case was not so clearly improper that claims commissioners or appellate judges can conclude that the staff breached any duty it owed to Ms. Cockrum. Accordingly, expert proof delineating the precise scope of the staff's duty and evaluating the adequacy of the staff's conduct was necessary. Mr. Cockrum cannot recover without it.

*Id.* at 438.

We find no basis upon which to distinguish the present case. The record shows that Mr. Pattee received continual care for his mental health needs and denied suicidal ideation on a multitude of occasions. The record further shows that a nurse met with Mr. Pattee following his transfer to Unit 7B and found that he was "alert, verbal, [and] appear[ed] to be in no distress." Just three days later, Dr. Arney met with Mr. Pattee and recorded the following: "[Patient] seen. He is quiet [and] sullen. No acute change in his condition seen. Overall stable. Continue current [treatment]." This is important because Ms. Griffis-Parrish testified that "[i]f Dr. Arney thought [Mr. Pattee] was a high risk for suicide, he would have put him on suicide precautions." Although Ms. Griffis-Parrish reported to the treatment team that she believed Mr. Pattee was at an increased risk for suicide, the treatment team decided after deliberation that additional precautions were unnecessary. We are unable to conclude that the decision of the treatment team was so clearly improper under the facts that expert testimony was not required to establish a breach of duty.

Thus, the controlling question is whether Ms. Atkinson presented the expert testimony

required to support her claim. She did not. The only expert testimony addressing the standard of care owed to Mr. Pattee establishes that it would have been reasonable to place Mr. Pattee on suicide watch; it does not establish the standards of care by which to evaluate the treatment team's decision, address whether other alternatives were available and appropriate, or examine the reasonableness of the treatment team's actions in light of prison procedures and policies. Furthermore, Ms. Atkinson's counsel conceded at oral arguments that placing Mr. Pattee on suicide watch was not the only potential action the treatment team or prison officials could have taken to protect Mr. Pattee. He went so far as to label that suggestion "absurd" and stated "there's a hundred ways that they could have kept him from killing himself; suicide watch was one of them." There is, however, absolutely no evidence detailing what these other possible courses of action entailed. Even if the treatment team knew or should have known that transferring Mr. Pattee to Unit 7B could have prompted him to inflict self-injury, the record simply lacks proof concerning the criteria for determining when suicide precautions should be used and whether the staff acted unreasonably by not imposing any or all of these restraints after Mr. Pattee's transfer.

Ms. Atkinson seeks to cure this deficiency by arguing that the Commission erred when it found Ms. Griffis-Parrish was unqualified to testify as an expert about the TDOC's suicide prevention policies and procedures or the reasonableness of the treatment team's conduct in failing to implement heightened suicide precautions. She submits that Ms. Griffis-Parrish worked exclusively at DeBerry from 2000 until 2002, during which she served as a member of Mr. Pattee's treatment team. Because the treatment team had the responsibility to advise prison officials on whether an inmate should be placed under heightened suicide precautions and what those precautions should consist of, Ms. Atkinson submits that Ms. Griffis-Parrish was qualified to testify as an expert about the TDOC's suicide prevention policies and procedures. The appellant also argues that Ms. Griffis-Parrish had the requisite knowledge, skill, experience, training, and education to testify concerning the decision to implement heightened suicide precautions. She maintains that Ms. Griffis-Parrish was particularly qualified to testify about the reasonableness of the treatment team's decision not to implement suicide precautions because Ms. Griffis-Parrish interacted with Mr. Pattee on a more regular basis than any other mental health professional at DeBerry. Ms. Atkinson reasons "[i]t is incongruous for the State to suggest that the TDOC employ Ms. Griffis-Parrish as an expert in a prison setting and give her training and experience in same and then assert she is not competent to testify as to these . . . . matters."

We are not persuaded by Ms. Atkinson's argument. First, it does not appear that Ms. Atkinson expressly offered or that the Commission expressly rejected Ms. Griffis-Parrish as an expert outside the area of psychiatric nursing during the hearing. The following exchange occurred at the hearing:

> Mr. Raybin:    Your Honor, we would ask that the Court permit Ms. Parrish to testify as an expert witness and also a treating person of Mr. Pattee.
>
> The Court:    Is there anything from the State?

Mr. Hudson:  I guess it depends on what she is going to testify about or give her expert opinion about. If it's an expert opinion with regard to -- in her capacity as an advanced practice nurse and those things that are incident to that, I think that's appropriate, but beyond that, I don't know. I haven't heard anything that would necessarily qualify her to give an opinion beyond those aspects of her profession.

The Court:  Okay.

Mr. Hudson:  She's not a psychiatrist. She's not a medical doctor or anything.

The Court:  Mr. Raybin, what do you see as being the thrust of Ms. Parrish's testimony?

Mr. Raybin:  Two grounds. One will be as a fact witness because she had many interactions with Mr. Pattee, and also to giving an opinion as to the appropriateness or inappropriateness of his treatment leading to his death, or lack of treatment. The ultimate issue of whether the Department of Correction[s] was negligent or not is for the Court to decide. She'll not voice an opinion about that. But the standard of care and what the Department could have done differently or better to have prevented Mr. Pattee's death, I think she can voice an opinion about that, not only because she's an expert and psychiatric nurse, she was there and she treated him.

Mr. Hudson:  Again, in response, I would say that her expertise may be in providing care as a nurse, but not necessarily in providing in the treatment of inmates in the corrections setting, to take into account those things that are germane to corrections, to security and things of that nature and to opine as to what security staff and things of that nature should have done.

She may be qualified to speak to what maybe other mental health professionals of -- with her qualifications might have been able to do, but insofar as she is going to testify with regard to what response the correction officials should have been to -- in the situation, I don't think that she is qualified to give such an opinion.

The Court:  Now, you indicated she was certified as a psychiatric -- adult psychiatric nurse?

Mr. Raybin:  Yes.

The Court:  And now is it your contention that her testimony will go outside of the area of the standard of care with respect to adult psychiatric nursing?

Mr. Raybin:    It's not going to go outside of that.

The Court:    Okay.

Mr. Raybin:    Now, as far as the correctional component of this - - well, let me just develop her testimony, if I might.

The Court:    Okay.

Mr. Raybin:    And I would suggest the government can object specifically if I get into prohibited terrain.

This exchange indicates that Ms. Atkinson only initially offered the testimony of Ms. Griffis-Parrish as an expert in the field of psychiatric nursing. Our review of the record reveals that the Commission never rejected or limited the testimony of Ms. Griffis-Parrish on any other subject. Rather, she simply did not testify about the standards of care that members of the treatment team—whether mental health professionals or prison staff—owed to Mr. Pattee, nor did she sufficiently develop her qualifications to do so. And it is undisputed that only these individuals, or possibly higher ranking prison officials who were not members of the treatment team, had authority to implement suicide precautions.

Even assuming the Commission impliedly rejected Ms. Griffis-Parrish as an expert on the relevant standards of care during the hearing, Ms. Atkinson made no offer of proof to demonstrate what Ms. Griffis-Parrish's testimony would have been regarding these issues. The Tennessee Rules of Evidence, which govern hearings before the Commission, *see* Tenn. Code Ann. § 9-8-403(a)(1); Tenn. Comp. R. & Regs. 0310-1-1-.01(11)(a)(1), provide that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context," Tenn. R. Evid. 103(a)(2). Unless an offer of proof is made, this Court is without sufficient information to determine whether exclusion of the evidence was reversible error. This is especially true when the excluded evidence consists of oral testimony. *See State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986). If the requisite offer of proof is absent from the record, this Court will not reverse an evidentiary ruling. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001) (citing *Shepherd v. Perkins Builders*, 968 S.W.2d 832, 834 (Tenn. Ct. App. 1997)). Because Ms. Atkinson made no offer of proof concerning Ms. Griffis-Parrish's intended expert testimony on the TDOC's suicide prevention policies and procedures or the reasonableness of the treatment team's conduct, we find no reversible error.

As a final matter, Ms. Atkinson argues that the Commission erred when it excluded instant message and electronic mail correspondence between her and Ms. Hilla. According to Ms. Atkinson, the excluded correspondence establishes: (1) an ongoing pattern of communication between Ms. Atkinson and Ms. Hilla dating back to 2001, (2) the TDOC's knowledge of a change in Mr. Pattee's

-11-

behavior the day before his death, and (3) the TDOC's knowledge that transferring Mr. Pattee heightened his risk for suicide. Although this correspondence corroborates the testimony of Ms. Griffis-Parrish, it is not entirely clear what benefit the appellant stands to gain if these communications are admitted.[9] The Commission ruled in favor of the State because Ms. Atkinson failed to offer expert testimony on the standards of care, not because it disbelieved the testimony of Ms. Griffis-Parrish on the question of notice. Admission of this correspondence would only serve to bolster unimpeached evidence already in the record. Assuming for the sake of argument that the Commission erred when it excluded this evidence, the decision did not affect its judgment or prejudice the judicial process. We accordingly hold that the alleged error was harmless. *See* Tenn. R. App. P. 36(b); *Blackburn v. Murphy*, 737 S.W.2d 529, 534 (Tenn. 1987) (citation omitted).

Ms. Atkinson has failed to provide expert testimony required to establish the applicable standards of care by which we can judge the actions of the prison officials and mental health professionals involved in the decision not to implement suicide precautions. Certainly, hindsight reveals that placing Mr. Pattee under suicide precautions likely would have averted his death during the period in question. But the fact that Mr. Pattee succeeded in his attempt to commit suicide does not in and of itself establish that members of the treatment team or other prison officials failed to act reasonably under the circumstances. And the persons responsible for evaluating Mr. Pattee and determining whether he should be placed on suicide precautions did not have the benefit of this hindsight when carrying out their responsibilities; they could operate only within their considered judgment. Whether these persons acted negligently in evaluating Mr. Pattee and performing their duties is not readily apparent; it is for this reason that expert proof is required to establish the criteria by which this Court can determine whether a breach of duty has occurred. Absent such proof, we are without standards by which we can judge the collective decision of the treatment team, the actions of individual members of the treatment team in their various capacities, or the conduct of prison officials charged with Mr. Pattee's care and custody. Accordingly, we cannot find a breach of duty and must hold that Ms. Atkinson has failed to establish an essential element of her negligence claim. As a result, the judgment of the Commission is affirmed. All other issues are pretermitted.

---

[9]Ms. Atkinson's counsel conceded at the hearing that the first set of correspondence only serves to corroborate Ms. Atkinson's testimony regarding the ongoing relationship between her and Ms. Hilla and that the third set of correspondence only serves to corroborate Ms. Griffis-Parrish's testimony that she informed the treatment team of her concerns regarding Mr. Pattee. The remaining set of correspondence appears to have been primarily offered to further demonstrate that the treatment team should have known that Mr. Pattee was at an increased risk of suicide following his transfer.

## V. Conclusion

For the foregoing reasons, we affirm the decision of the Commission. Costs of this appeal are taxed to the appellant, Shirley Ann Atkinson, and her surety for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE