# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### ASSIGNED ON BRIEFS OCTOBER 4, 2010

## ROBERT BROWN, An Incompetent, by and through next friend ANGELA ANDERSON v. STATE OF TENNESSEE

**Direct Appeal from the Tennessee Claims Commission**
**No. 20070739      Nancy C. Miller-Herron, Commissioner**

---

**No. W2010-01036-COA-R3-CV - Filed December 15, 2010**

---

Appellant, who was not placed on fall observations until after his fall, suffered a fall while under the care of the Western Mental Health Institute. A CAT scan performed three days after the fall revealed no hemorrhaging, however, a repeat scan performed approximately one month later revealed a subdural hematoma for which Appellant subsequently underwent two surgeries. Appellant, by and through his next friend, filed suit against the State in the Claims Commission alleging medical negligence. Following a trial, the Claims Commission found that a Western nurse breached the standard of care in completing the initial fall risk assessment, but that Appellant had failed to prove that such breach was a proximate cause of his fall. Additionally, the Commission found that Appellant had failed to prove that Western's failure to later place Appellant on fall observations was a proximate cause of his fall. Finally, the Commission found that Appellant had failed to prove by a preponderance of the evidence that Western's failure to order repeat brain imaging prior to January 26, 2006, was a breach of the standard of care. We affirm the judgment of the Commission.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Claims Commission Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Michael A. Anderson, Chattanooga, Tennessee, for the appellant, Robert Brown, by and through next friend Angela Anderson

Robert E. Cooper, Attorney General and Reporter, Michael E. Moore, Solicitor General, Mary M. Bers, Senior Counsel, Nashville, Tennessee, for the appellee, State of Tennessee

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

At 11:00 PM on December 19, 2005, Robert Brown was admitted to the Western Mental Health Institute ("Western") "after fighting with delusional beings at his doctor's appointment." On admission, Mr. Brown was noted as having agitation, delusions, hallucinations, "difficulty concentrating, irritability, confusion manifested by short-term memory loss, long-term memory loss, and disorientation." His admitting diagnosis was vascular dementia with delusions.

Typically, within twenty-fours of admission to Western, a new patient is assessed by a nurse concerning nutrition, fall risk, and "a number of other things[,]" a social worker regarding "background history[,]" and an internist or nurse practitioner at Western's health services clinic for a "history, physical, and neurological screening evaluation."

Nurse Jamie Cox completed the 12-page "Nursing Admission Assessment" the night Mr. Brown was admitted to Western. As part of this assessment, she completed the "Nursing Fall Risk Assessment" which lists ten factors to be considered by the nurse, and "if yes is checked on any of the above criteria, the service recipient is to be placed on fall observations, notify physician for further orders or instruction and flag service recipient's chart." The ten "fall risk" factors are as follows: orthostatic hypotension, unsteady or shuffling gait, prior falls during past 3 months, two or more falls within a 7-day period, uses wheelchair or other orthotic device, impaired vision, impaired hearing, impaired cognition (confused, resistive, disoriented), incontinent or needs assistance with toileting, or language barrier. Nurse Cox drew a line through the "no" column indicating that none of the criteria were present in Mr. Brown's case; however, in other portions of the Nursing Admission Assessment, she noted that Mr. Brown was "confused" and had "poor balance." Mr. Brown was not placed on fall observations.

At 7:25 AM on December 25, 2005, Mr. Brown fell in a hallway near the medication room. He was transferred to Bolivar General Hospital where the emergency room physician noted swelling to Mr. Brown's right temporal area, but indicated that he was "alert" and "ambulatory." That same day, Mr. Brown returned to Western, and a second "Nursing Fall Risk Assessment" was made of Mr. Brown, with three "fall risk" factors–unsteady or shuffling gait, impaired cognition, and incontinence–indicated.[1] Therefore, from the time

---

[1]The second assessment was made while Mr. Brown was at Bolivar General Hospital. The parties disagree whether the factors indicated were observed prior to or after Mr. Brown's fall, and from the record
(continued...)

of his return to Western until his discharge, Mr. Brown was placed on fall observations.

For the first day and a half following his return to Western, Mr. Brown received hourly "neuro checks"–checking vital signs; pupil reactivity, shape, and size; and limb strength. All were "within normal limits." However, On December 28, 2005, Western psychiatrist Kevin Turner, M.D. sent Mr. Brown back to Bolivar General Hospital for a CAT scan "to rule out any intracranial problem" and "to see if there was blood in the brain." The December 28 CAT scan found "no evidence of an acute intraaxial or extraaxial hemorrhagic event."

For "several weeks" after Mr. Brown's fall, Dr. Turner observed no signs of deterioration. However he testified that on January 23, "we started noticing that he was showing unusual signs of drowsiness, impaired cognition in that sense." Believing the drowsiness was "probably" an effect of Mr. Brown's "heavy, sedating medications[,]" from January 23 to 25, Dr. Turner reduced and then eliminated Mr. Brown's medications, with the exception of the anti-seizure drug Dilantin . When he saw no improvement from withholding medications, Dr. Turner ordered an emergency room evaluation and a follow-up CAT scan. A January 26, 2006 CAT scan revealed a subdural hematoma for which Mr. Brown subsequently underwent two surgeries.

On December 21, 2006, Mr. Brown, by and through next friend, Angela Anderson, filed a "Notice of Claim" in the Tennessee Claims Commission, Division of Claims Administration, for medical negligence as a result of the December 25, 2005 fall. On May 4, 2007, Mr. Brown filed his Complaint in the Tennessee Claims Commission, Western Division.

Following a trial on November 18, 2009, a judgment was entered for the defendant State of Tennessee. The Claims Commission found that Nurse Cox had breached the standard of care in completing the fall risk assessment upon admittance. However, it found that Mr. Brown had failed to prove that Nurse Cox's "botched" fall risk assessment or the subsequent decisions not to place Mr. Brown on fall observations was a proximate cause of his fall. Furthermore, the Claims Commission found that Mr. Brown had failed to prove by a preponderance of the evidence that the failure of Western's doctors to order subsequent brain imaging prior to January 26, 2006, was a breach of the standard of care. Mr. Brown appeals.

## II. ISSUES PRESENTED

---

[1](...continued)
it is unclear.

Appellant presents the following issues for review:

1.     Whether the Claims Commission erred in failing to find the State liable for failing to prevent Robert Brown's fall at Western Mental Health Institute; and

2.     Whether the Commission erred in failing to find the State liable for failing to timely diagnose Mr. Brown's hematoma.

For the following reasons, we affirm the decision of the Claims Commission.

### III.   STANDARD OF REVIEW

"Our review of decisions of individual claims commissioners and those of the Claims Commission are governed by the Tennessee Rules of Appellate Procedure." *Jones v. Davis*, No. M2004-01522-COA-R3-CV, 2006 WL 1044099, at *2 (Tenn. Ct. App. Apr. 19, 2006) *perm. app. denied* (Tenn. Oct. 16, 2006) (citing Tenn. Code Ann. § 9-8-403(a)(1)).  On appeal, the Claims Commission's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d) (2008)**; *Waller v. State,* No. M2005-02056-COA-R3-CV, 2006 WL 2956515, at *4 (Tenn. Ct. App. Oct.16, 2006).  For the evidence to preponderate against such a finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson,* 196 S.W.3d 695, 701 (Tenn. Ct. App.2005) (citing *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App.1999)).  When the Claims Commission makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond,* 521 S.W.2d 806, 808 (Tenn. 1975)).  We accord great deference to the Claims Commission's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary.  *Wells v. Tenn. Bd. of Regents,* 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted).  We review the Claims Commission's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

### IV.   DISCUSSION

### A. Failure to Prevent Fall

On appeal, Mr. Brown argues that the Commission correctly found that there was a breach in the standard of care regarding the initial fall risk assessment by Nurse Cox, but that it erred in finding that Mr. Brown failed to prove that such breach was the proximate cause of his fall. Additionally, Mr. Brown argues that the Commission erred in finding that he had failed to prove that Western's failure to subsequently place Mr. Brown on fall observations was the proximate cause of his fall.

Extensive testimony was presented in this case regarding Western's fall observation protocols as well as Mr. Brown's physical and mental condition preceding the fall. Upon admission, a nurse completes a "Nursing Admission Assessment," which includes a "Nursing Fall Risk Assessment." If any of the ten "fall risk" factors are indicated, the patient "is to be placed on fall observation" and the physician notified for further orders. Nurse Cox testified that she completed the fall risk assessment based on an incomplete observation of Mr. Brown, due to his being uncooperative and confused. After observing his poor balance and confusion, she forgot to correct the initial fall risk assessment, which she admitted she probably should have done.

According to Western nurses Mary Beth Pearson and Marilyn Russell and Western psychiatrist Dr. Turner, doctors, rather than nurses, have the authority to place a patient on fall risk protocol. Nurse Pearson stated that doctors rely upon nursing assessments, but that the doctors, themselves, make the "final call" based on their own personal assessment of a patient. Similarly, Dr. Turner testified that doctors look at the initial nursing assessment as a "piece of information[,]" but that they "evaluate the patient on [an] ongoing basis, we're constantly looking at the possibility of a fall risk." He stated that if a nurse checks "yes" on his or her assessment, the physician "asses[es] the situation and [] determine[s] whether or not it substantiates placing the patient on fall risk." He reiterated that even when a nurse checks "yes," "the physician has the final word on placing the patient on fall [observations]" as it is a "matter of professional determination."

Much testimony was also presented regarding the "ongoing" nature of the fall risk assessment. Dr. Turner testified that Mr. Brown "was seen by several physicians . . . the patient was also assessed in the medical clinic, and the patient was seen by [him]self; and every time that patient was seen, then the risk of fall would have been assessed." In fact, Dr. Turner stated, "I saw him five days a week. He was seen several times in the clinic. We followed him constantly." Nurse Russell testified that she did not believe other nurses would "go back and review" Nurse Cox's initial assessment, stating that "we see the patient on a daily basis, and we . . . assess them for what's going on right now when we see them. Not

for what happened yesterday but what are they doing today." Nurse Pearson testified, "I make my assessment on a daily basis." Thus, she claimed, Nurse Cox's initial assessment did not factor in to her own assessment of Mr. Brown. She stated that "you assess a patient every time you see a patient. So, I mean, when you're seeing a patient on the floor giving them medicines, you would assess your patient." She explained that patients on "acute status," such as Mr. Brown, are seen by a treatment team each weekday. "The patient comes into the treatment team room, the doctor assesses them and makes decisions based on his assessment[,] based on the other team members' assessment as how he's doing in the day." Additionally, acute patients are "noted every fifteen minutes on paper, but they're observed continuously."

> Nurse Russell explained what happens when a patient is placed on fall observations:
> We would flag the chart fall obs, and we would put fall observations on the technician assignment sheet that was assigned to him -- it would be on his sheet, whoever had him -- and we would pass it on in report.
>
> It was really just to let all the staff know that this patient had been identified as a patient who was at risk to fall, and that's all it meant. We wouldn't do anything different for that patient.

She further explained that being placed on fall observations does not require a technician to "be right next to that person[,]" and that patients on fall observations are allowed to go anywhere in the unit in which patients are allowed to enter, including the hallways, which "are always kept clear." However, such patients are not allowed to travel long distances, for example, to the gymnasium. She stated that her care of Mr. Brown on December 25 would have been no different had he been on fall observations at that time. Dr. Turner also described fall observations:

> Basically, it's something set up to reduce risk of fall. For example, making sure the patient['s] shoe laces are tied, that kind of thing, or shoes are correctly fitted; making sure that the patient's clothes are appropriately fastened so that that wouldn't be something to cause them to trip. If the patient needed some type of assistance such as a walker or cane . . . or needed a wheelchair, you provide those kinds of things.

Nurses Pearson and Russell and Dr. Turner also testified regarding the fall risk assessment factors and a patient's ability to ambulate. Dr. Turner acknowledged that Mr. Brown had "confusion and disorientation[;]" but he claimed that "we don't place every confused patient on fall risk. That's only one of many factors that we look at." Furthermore, he claimed that confusion, agitation, and a history of wandering would not be determinative

in placing a patient on fall risk.  Instead, shuffling or imbalance would be a "stronger consideration" to place a patient on fall observations.  Nurse Pearson testified that "poor balance" upon admission would not necessarily warrant a patient's placement on fall observations.  In her opinion, at least two instances of poor balance would be required to place a patient on fall observations.  According to Nurse Pearson, disorientation also plays no role in patient's ability to ambulate, as "disorientation" relates only to patients' inability to know who they are, where they are, the time of day or month, or what kind of situation they are in.  Nurse Russell also testified that a "confused" person can still ambulate, and that "disorientation" does not affect a patient's ambulation.

Finally, Nurse Russell and Dr. Turner testified concerning their observations of Mr. Brown prior to the fall.  Nurse Russell stated that she saw Mr. Brown on the morning of December 25, 2005 prior to his fall.  She claimed that if he had been having problems with his balance or had been stumbling or unsteady that she would have observed it and noted it in his chart; however, she charted nothing of that nature.  Additionally, Dr. Turner testified that based on his observing Mr. Brown, "I would have noted if there was a gait disturbance. I didn't see any gait disturbance. . . . And based upon what I saw at the time I did the evaluation, I didn't see a need to put him on a fall risk."

At trial, Mr. Brown presented the testimony of two expert witnesses in support of his contention that the failure to place him on fall observations violated the standard of care.[2] Nurse Donna Bledsoe testified that Western breached the requisite standard of care by failing to appropriately complete the initial fall risk assessment and in failing to reassess Mr. Brown's fall risk following a change in his medication, and that these failures may have contributed to his fall.  Nurse Bledsoe testified that "in addition to several regular medicines that increase the risk of falls," Mr. Brown received Ativan daily from December 20 to 24, which "is sometimes sedating, also causes some difficulty with balance at times, and even increases that confusion at times."  She  also testified that given Mr. Brown's periodontal disease, a pain assessment should have been completed on every shift.  Although she could not say to what extent Mr. Brown's dental pain contributed to his agitation, she claimed that his agitation could have affected his judgment, resulting in a fall.  Additionally, she claimed that the failure to address his pain could have led to an increased need for Ativan for agitation, which may have affected his balance.

Gary Salzman, M.D., an internal medicine specialist, also testified that Western breached the standard of care by not placing Mr. Brown on fall precautions when he was

---

[2]Donna Bledsoe testified by deposition.

admitted on December 19 exhibiting signs of confusion, poor balance, and disorientation.[3] Dr. Salzman conceded that even if the standard of care was followed, a patient could still get hurt. However, he inferred that fall precautions would have prevented Mr. Brown's fall because after he was placed on fall precautions, he did not experience another fall.

Patricia Cunningham, a nurse practitioner with a doctorate in psychiatric mental health nursing, testified as an expert on behalf of the State. Nurse Cunningham found no breach of the standard of care with regard to Mr. Brown's fall. She acknowledged that the initial fall risk assessment was not completed correctly; however, she opined that this failure did not put Mr. Brown at risk because the factors listed on the initial fall risk assessment would have been the same factors considered in subsequent assessments of Mr. Brown. Likewise, she stated that any later failure to evaluate Mr. Brown's mental or physical condition did not contribute to his fall because "the record shows him being so well observed by the staff." Nurse Cunningham found no connection between Mr. Brown's dental pain, confusion, agitation, or disorientation and his fall. Likewise, she stated that his medications had no connection to his fall, as "he's very aggressive and out of control. . . . so the sedating effects . . . are not applying to Mr. Brown." According to Nurse Cunningham, fall observations would not have prevented Mr. Brown's fall, because although fall observations increase surveillance, they in no way limit where a patient may go in the acute unit.

To recover under the medical malpractice statute, Mr. Brown must prove by expert testimony: (1) "[t]he recognized standard of acceptable professional practice in the profession and the specialty . . . in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;" (2) that the defendant failed to adhere to such standard; and (3) as a result of that failure, the plaintiff suffered injuries that otherwise would not have occurred. **Tenn. Code Ann. § 29-26-115 (Supp. 2008)**. Because his action is based on "[n]egligent care, custody and control of persons" pursuant to Tennessee Code Annotated section 9-8-307(a)(1)(E), Mr. Brown must also prove "duty, breach of duty, causation in fact, proximate causation, and damages." *Atkinson v. State*, No. M2009-02587-COA-R3-CV, 2010 WL 2730575, at *4 (Tenn. Ct. App. July 9, 2010) (citing *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)).

The Commission correctly acknowledged that the State owes a duty of care to Mr. Brown as a mental health institution patient. *See Conley v. State*, 141 S.W.3d 591, 599 (Tenn. 2004) (citing *Hembree v. State*, 925 S.W.2d 513, 517 (Tenn. 1996)). It further found

---

[3]At trial, Dr. Salzman based his opinion "solely" on Nurse Cox's initial assessment; however, in his affidavit he stated that Western nurses failed to adequately monitor Mr. Brown to prevent his fall and that such failure caused or contributed to his fall.

that in improperly completing the initial fall risk assessment upon admission, Nurse Cox breached the standard of care. However, the Commission found that Mr. Brown failed to prove that Nurse Cox's failure or the subsequent decision not to place him on fall observations was a proximate cause of his fall, and we agree.

Clearly Nurse Cox did not follow Western protocol in completing the initial fall risk assessment of Mr. Brown. However, the testimony of Nurses Russell and Pearson and Dr. Turner demonstrates that Mr. Brown was under near-constant surveillance and assessment, such that he could have been placed on fall observations if necessary. Nurse Russell and Dr. Turner further testified that they observed Mr. Brown prior to his fall and detected no balance problem or gait disturbance warranting such placement. Additionally, the testimony established that even if Mr. Brown had been on fall observations, he would have been allowed, unaccompanied, in the hallway where the fall occurred. Finally, we note that because of the ongoing nature of the assessments, even if Mr. Brown had been placed on fall observations when he arrived at Western, he could have been removed from such status at any time. Based on the record in this case, we affirm the Commission's finding that Mr. Brown failed to prove that Western's improper completion of the initial risk assessment or any failure by Western to later place Mr. Brown on fall observations was a proximate cause of his fall.

### B. Failure to Timely Diagnose

Next, we address Mr. Brown's contention that the Commission erred in not holding the State liable for failing to timely diagnose his subdural hematoma. Dr. Salzman testified as an expert for Mr. Brown on this issue. According to Dr. Salzman, Mr. Brown began demonstrating signs or symptoms of a subdural hematoma as early as January 2, 2006, as Nurse Russell's 8:30 AM "Progress Notes" state that he "appears sleepy" and "requires max[imum] assistance [with activities of daily living.]" Then, from January 20 to 26 he embarked on a "marked downhill course" "where he's no longer needing as-needed sedatives, he's documented as becoming more sleepy, more lethargic, they have to feed him where he was eating on his own before." For example, at 9:30 AM on January 22 Nurse Russell's Progress Notes indicate that "Patient is up this AM sitting in room[,] smiling face[,] Slept through the Night. No PRN injection required yesterday. Behavior improving. Answers questions this AM appropriately although oriented to name only," and on January 24 he is described as "very lethargic[,]" but "arouses to tactile stimulation." This change from agitation and threatening conduct to calm behavior, Dr. Salzman testified, could mean "he's responding to medicine and he's improving[,]" or "that he's starting to become more sedated because of an expanding subdural hematoma." He testified that "a CAT scan can

miss an early subdural hematoma. . . . [so] if the patient doesn't seem to be getting better or there's no improvement in the patient, then a repeat imaging would be important." Additionally, he opined that Mr. Brown's head injury coupled with the fact that he was taking Coumadin, a blood thinner, required increased monitoring and evaluation of Mr. Brown.

Dr. Salzman acknowledged that Mr. Brown's increased lethargy could be due to his being "overmedicated" and he conceded that reducing Mr. Brown's medication was appropriate. However, he testified that because a subdural hematoma "is certainly a more life-threatening issue . . . . the priority would be to image his head to make sure that he hasn't had a subdural hematoma." He stated, "you can't wait two days and reduce his medication and if he doesn't get better, then send him for a CAT scan." In his opinion, Western breached the standard of care by failing to order repeat brain imaging by January 25, because after that date, he claimed, "I think it was too late."

Western psychiatrist Dr. Turner offered testimony regarding Mr. Brown's subdural hematoma diagnosis. He stated that "the entire time of [Mr. Brown's] stay, he was, on an ongoing basis, being evaluated in regards to his neurological status." For "several weeks" after his fall, Mr. Brown showed no signs of deterioration. On January 20, Mr. Brown was noted as being "hostile and aggressive[,] swinging [at] techs and peers[,] cursing and threatening[.] . . . PRN of Ativan[.]" This behavior, according to Dr. Turner, was consistent with Mr. Brown's conduct since his admission to Western. The following morning, Mr. Brown was "[q]uiet and calm at present[,]" but also "aggressive [at] times." Dr. Turner testified that on January 23 "we started noticing that he was showing unusual signs of drowsiness, impaired cognition in that sense. That would indicate that . . . something, probably, was going on." That Mr. Brown had suffered a head injury was "always a consideration in the back of [his] mind. . . . [b]ut at that point, it was not the primary consideration because he had done so well, and this was now three to four weeks later." According to Dr. Turner, bleeds weeks after an incident "would be extremely rare." Based on his belief that Mr. Brown's behavioral changes were due to a "build up" of "heavy, sedating medications," from January 23 to 25, Dr. Turner reduced and then eliminated Mr. Brown's medications, with the exception of Dilantin. However, when Mr. Brown continued to deteriorate despite the withholding of his medications, he was sent for a repeat CAT scan.

Additionally, Nurses Russell and Pearson testified regarding the changes in Mr. Brown's behavior between January 20 and 26. Nurse Russell's January 16 nursing note indicated that Mr. Brown "remains confused, disoriented and agitated easily, Becomes aggressive and hostile . . . Continues to require 1-2 PRN injections for his aggressive

threatening behavior but they are effective for a while. Incontinent of bowel and bladder, wears diapers. . . . Does not sleep well at night[.] However, within days, the following changes were noted: Mr. Brown had to be fed his meals, he had "no behavior problems," he was no longer requiring Ativan injections, he was calm, and he was "sleepy but easily aroused." Additionally, Nurse Pearson noted that by January 24 Mr. Brown was "very lethargic" and unable to take his medications by mouth.

Neurologist Gary Duncan, M.D., testified as an expert on behalf of the State. He observed Western's conduct in sending Mr. Brown back to the emergency room for a CAT scan on December 28, 2005, three days after his fall. He opined that "[t]he standards would say that that's all you need to do. . . . if you're going to have an enlarging subdural, you'd expect, by all odds, that it would be visible by the third day." When questioned as to the emergence of the subdural hematoma, Dr. Duncan concluded that either "there was a very tiny subdural that was not picked up and that enlarged" or that "he had another injury and created another subdural[,]" although he acknowledged that there was no evidence of a subsequent head injury

Regarding changes in Mr. Brown's behavior, Dr. Duncan stated his "behavior was variable throughout his stay . . . consistently variable, that there would be times that maybe he was not as alert and then soon he'd be striking out and displaying aggressive behavior." On the morning of January 24 Mr. Brown was noted as "very quiet" but "alert" during a dental consultation, but as "very lethargic" by 8:00 PM that night. The following day, he was noted as "asleep but opens eyes to verbal stimuli. Pupils equal and reactive[,]" which Dr. Duncan testified is "normal" and does not indicate the possibility of a neurological issue. According to Dr. Duncan, "there was nothing that had the stamp, if you will, to a doctor to say, 'This is a subdural hematoma.' It was just mental status variability, and there were plenty of other causes and reasonable reasons for the variability." Instead, Dr. Duncan testified that signs of a subdural hematoma include "an asymmetry, perhaps, of one side versus the other, a crooked smile or an inability to use one arm versus the other[,]" weakness or vision loss, or new speech abnormalities.

Addressing the notations that Mr. Brown was "sleepy" and "very lethargic," Dr. Duncan stated that "[s]leepiness is not a sign of a subdural hematoma. It's not indicative of it[,]" and "[l]ethargy can be due to many, many things." "You can be lethargic, certainly, with a subdural, but it's not the symptom that turns the light bulb on to say this is a subdural." In fact, Dr. Duncan testified that "[i]n this man's case, I think the light bulb goes on he's overmedicated because he is on a lot of medications." Thus, he opined that Western did not violate the standard of care in first reducing Mr. Brown's medications and then ordering

repeat brain imaging.

> [I]n a guy who we've been told does not have a subdural, that he is now more lethargic and we're giving him medications, the most logical thing to do is stop his medications safely and see if the patient wakes up. He'd been there for at least a month, and medications may have finally taken effect and maybe he's too sedated, too medicated.
>
> . . . .
>
> This is a reasonable diagnosis, that he's had too much medication. They did the reasonable thing.[4]

Although he conceded that a patient on Coumadin who receives a head injury is at a greater risk of a subdural hematoma, he opined that Mr. Brown's receiving Coumadin did not alter the required standard of care. Finally, Dr. Duncan disagreed with Dr. Salzman's conclusion that if a repeat CAT scan had been performed by January 25 that Mr. Brown's injuries would have been reduced. Dr. Duncan stated, "There's no way to know that. . . . [T]here was nothing that happened, that I recall, to him, specifically, between the 25th and 26th that indicated his brain was damaged except for the lethargy."

In rendering its lengthy judgment, the Commission "gave a little more weight to the testimony of Defendant's expert, neurologist Gary Duncan, M.D." as compared to Mr. Brown's expert, Dr. Salzman. The Commission found that Mr. Brown failed to prove by a preponderance of the evidence that the failure of Western's physicians to order repeat brain imaging prior to January 26, 2006, breached the standard of care. Specifically, the Commission stated:

> There is no question that Robert Brown's fall at Western on December 25, 2005, resulted in devastating and permanent injuries that have greatly affected his life, and that of his family. However, given the results of the CT scan on December 28, 2005, indicating Brown did not have a subdural hematoma, the absence of more definite neurological symptoms (besides lethargy) during the January 22-25, 2006 time frame, the types of lethargy-inducing drugs Brown was taking, and the passage of almost a month between the fall and the manifestation of Brown's brain injury, the Commission FINDS

---

[4]In his brief, Mr. Brown points out that Dr. Duncan, in his testimony, stated that reducing Mr. Brown's medication was reasonable, stating "I think it's what I would do." Mr. Brown argues that the Commission erred in giving credence to this testimony; however, after considering his testimony as a whole, we find that Dr. Duncan's statement does not indicate that he based the requisite standard of care upon what he would have done. This issue is without merit.

-12-

that Claimants did not prove by a preponderance of the evidence that Western doctors breached the standard of care by failing to send Mr. Brown for a second brain scan before January 26, 2006.

After reviewing the record *de novo* while according "great deference" to the trial court's determinations on witness credibility, we affirm the Commission's dismissal of Mr. Brown's claim. Although the record demonstrates some non-neurological-specific behavioral changes in Mr. Brown during the period of January 22-25, according to Dr. Duncan, Western responded appropriately to these changes by altering Mr. Brown's medications prior to ordering repeat brain imaging. Additionally, he testified that "[t]here's no way to know" whether brain imaging on or before January 25 would have reduced Mr. Brown's injuries. Based on Dr. Duncan's testimony as well as the reasons set forth by the Commission, we find that Mr. Brown failed to prove by a preponderance of the evidence that Western breached the standard of care by failing to order repeat brain imaging prior to January 26, 2006. The judgment of the Commission is affirmed.

## V. CONCLUSION

For the aforementioned reasons, we affirm the judgment of the Commission. Costs of this appeal are taxed to Appellant, Robert Brown, by and through next friend, Angela Anderson, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

-13-