FILED
04/19/2017
Clerk of the
Appellate Courts



# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
March 7, 2017 Session

## SHARYN HAYNES, ET AL. v. WAYNE COUNTY, TENNESSEE

**Appeal from the Circuit Court for Wayne County**
No. 4525    Russell Parkes, Judge

_____

## No. M2016-01252-COA-R3-CV

_____

This is an appeal from the trial court's grant of summary judgment to the defendant, Wayne County, in a wrongful death action filed under the Governmental Tort Liability Act. The plaintiff's grandson committed suicide several hours after being released from the defendant's jail. The plaintiff filed this wrongful death action alleging that his death was caused by the defendant's negligence in releasing him from custody in an intoxicated state without a mental health evaluation and without notifying his family of suicidal threats that he made while incarcerated. Having reviewed the record, we conclude that the plaintiff's evidence at the summary judgment stage is insufficient to establish that the defendant breached its duty of care to the decedent or that its conduct was a proximate cause of his death. We therefore affirm the trial court's grant of summary judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Russell Belk and Taylor Sutherland, Nashville, Tennessee, for the appellant, Sharyn Haynes.

Robyn Beale Williams and Ross V. Smith, Nashville, Tennessee, for the appellee, Wayne County, Tennessee.

## OPINION

### I. BACKGROUND AND PROCEDURAL HISTORY

The decedent, twenty-year-old Philip Haynes, was arrested for underage consumption, public intoxication, and resisting arrest in the early morning hours of July

17, 2010. Mr. Haynes, his cousin, and another man had stopped to use the restroom at a truck stop in Clifton, Tennessee. All three men had been drinking, but Mr. Haynes was the most intoxicated of the group. Mr. Haynes caught the attention of police officers in the truck stop's parking lot when he stumbled getting out of the car. The officers asked the men to step out of the car and instructed them to sit on a nearby trailer while they investigated. While they were sitting on the trailer, Mr. Haynes became upset. According to his cousin, Mr. Haynes started crying and saying "this is it" repeatedly. The cousin, fearful that Mr. Haynes would try to get back into the car and follow through on past threats to commit suicide by running into a semi-trailer truck, tried to calm Mr. Haynes. Despite his efforts, Mr. Haynes attempted to run back to the car. The officers stopped Mr. Haynes before he reached the car and put him in handcuffs. The officers placed Mr. Haynes under arrest and transported him to the Wayne County Jail.

The officers arrived at the Wayne County Jail with Mr. Haynes at approximately 3:00 a.m. There, they transferred him to the custody of Wayne County Sheriff's Deputies Jonathan Prince and Kevin Clayton. According to Deputy Prince, Mr. Haynes was "really, really intoxicated to the point of passing out" when he arrived at the jail. Mr. Haynes had vomited on himself in the patrol car and was unable to walk into the jail without assistance. After they walked him into the jail, Mr. Haynes asked Deputies Prince and Clayton if their guns were real. When the deputies replied that they were, Mr. Haynes asked the deputies to shoot him. Deputy Clayton reported Mr. Haynes's statement to the booking officer, Correctional Officer Kent Dugger. As part of the booking process, Officer Dugger asked Mr. Haynes a series of standard medical questions and recorded his answers on a medical form. The medical form reflects that Mr. Haynes told Officer Dugger that he was suffering from depression and had attempted to commit suicide "several times" in the past.

Due to his concern that Mr. Haynes posed a suicide risk, Officer Dugger put Mr. Haynes in a suicide prevention suit and placed him on suicide watch in an isolated cell with cameras. Officer Dugger monitored Mr. Haynes for the remainder of his shift, and Mr. Haynes slept in his cell without incident. At the time, a non-profit health care organization called Centerstone had a mobile crisis response team that would evaluate and provide mental health services to suicidal inmates at the jail free of charge. The jail did not have a contract with Centerstone, but Officer Dugger was aware of its services and had called Centerstone in the past when an inmate attempted to hang himself in his cell. Officer Dugger testified in his deposition that he elected not to call Centerstone to evaluate Mr. Haynes because Mr. Haynes had only made a suicidal threat as opposed to an actual suicide attempt. In any event, Centerstone's policies stated that services to intoxicated individuals would not be offered until the individual was no longer in an intoxicated state. Wayne County Sheriff Rick Wilson also testified in his deposition that

Centerstone's mobile crisis response team would not come to the jail to evaluate intoxicated inmates.

When Officer Dugger's shift ended at 6:00 a.m., he was replaced by Correctional Officer Justin Sanders. Officer Dugger advised Officer Sanders of Mr. Haynes's suicidal threat and that Mr. Haynes was on suicide watch. He also advised Officer Sanders that Mr. Haynes would be eligible for release after Officer Sanders finished making his morning rounds. Officer Sanders testified in his deposition that he offered breakfast to Mr. Haynes around 6:30 a.m., but Mr. Haynes declined it. Between one and two hours later, Mr. Haynes called for Officer Sanders and requested a blanket. Rather than give Mr. Haynes a blanket, Officer Sanders informed Mr. Haynes that he was eligible to be released. Officer Sanders testified that he then asked Mr. Haynes if he remembered making a suicidal threat the night before. According to Officer Sanders, Mr. Haynes replied in a joking manner that he remembered making the statement but was just drunk and did not mean it. Officer Sanders then removed Mr. Haynes from his cell and began filling out paperwork for his release from custody. According to Officer Sanders, the release process took about an hour and Mr. Haynes seemed fine during that time. Officer Sanders testified that Mr. Haynes was joking and laughed about the vomit on his clothes. Officer Sanders testified that he did not feel that there was any need to contact a medical provider before releasing Mr. Haynes because Mr. Haynes was fine.

Officer Sanders released Mr. Haynes from the Wayne County Jail at approximately 9:30 a.m. Sometime around 10:00 a.m., Mr. Haynes called his cousin who had been with him the night before and asked to be picked up from a McDonald's restaurant. Because he did not have a car, the cousin told Mr. Haynes's grandmother and guardian, Sharyn Haynes, that Mr. Haynes had been arrested and needed to be picked up. Ms. Haynes and the cousin drove to the McDonald's to pick up Mr. Haynes, but he was not there when they arrived. After driving to the jail to look for him there, they eventually found Mr. Haynes walking on the side of the road. Ms. Haynes testified in her deposition that Mr. Haynes appeared to be still intoxicated when they picked him up. She also testified that Mr. Haynes appeared to be angry with himself and that they sat in silence on the ride back to her house. Ms. Haynes drove Mr. Haynes to her house and left him there alone while she took the cousin back to his mother's house. Mr. Haynes fatally shot himself shortly thereafter at approximately 11:49 a.m.

In July 2011, Ms. Haynes (hereinafter "Plaintiff"), acting as Mr. Haynes's heir and next friend, filed a wrongful death action against Wayne County ("Defendant").[1] Her

---

[1] Plaintiff also named the Wayne County Sheriff's Department and the Wayne County Sheriff's Office Division of Corrections as defendants in her complaint. During the trial court's summary judgment hearing, however, Plaintiff's counsel conceded that those two entities were not proper parties to the

complaint alleged that Mr. Haynes's death was the result of Defendant's negligence in releasing him from custody in an intoxicated state without having him evaluated by a mental health professional and without notifying his family of the suicidal threats that he made while incarcerated. In its answer, Defendant denied the allegations of negligence and asserted that any negligent conduct on its part was not the proximate cause of Mr. Haynes's death. Following a period of discovery, Defendant filed a properly supported motion for summary judgment in July 2015. Plaintiff opposed the motion in September 2015. In October 2015, the trial court granted Defendant's motion for summary judgment, concluding that Defendant had negated the breach of duty and proximate causation elements of Plaintiff's negligence claim. Thereafter, Ms. Haynes filed a timely notice of appeal to this Court.

## II. ISSUES

Ms. Haynes presents the following issue on appeal, as we have restated it:

1. Whether the trial court erred in granting Defendant's motion for summary judgment.

Wayne County presents the following additional issue, as we have restated it:

1. Whether Ms. Haynes has standing to bring this cause of action.

## III. STANDARD OF REVIEW

This is an appeal from the trial court's grant of a motion for summary judgment. We review a trial court's summary judgment ruling de novo with no presumption of correctness. *Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we must make a fresh determination as to whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Id*.

Rule 56 provides that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. When the party moving for summary judgment will not have the burden of proof at trial, it may satisfy its initial burden of production either (1) by affirmatively negating an essential

---

lawsuit. The trial court therefore dismissed all claims as to those two parties. Plaintiff does not challenge that ruling on appeal.

element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015). If the moving party fails to meet its initial burden of production, then the nonmoving party's burden is not triggered, and the court should dismiss the motion for summary judgment. *Town of Crossville Hous. Auth. v. Murphy*, 465 S.W.3d 574, 578-79 (Tenn. Ct. App. 2014) (citing *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008)). If, however, the moving party does make a properly supported motion for summary judgment, then the burden of production shifts to the nonmoving party to demonstrate the existence of a disputed fact requiring trial. *Id*. at 578 (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

To survive a properly supported motion for summary judgment, the nonmoving party "'may not rest upon the mere allegations or denials of its pleading,' but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, 'set forth specific facts' *at the summary judgment stage* 'showing that there is a genuine issue for trial.'" *Rye*, 477 S.W.3d at 265 (quoting Tenn. R. Civ. P. 56.06). The nonmoving party must demonstrate the existence of specific facts in the record that could lead a rational trier of fact to find in favor of the nonmoving party. *Id*. If adequate time for discovery has passed and the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial, then the motion for summary judgment should be granted. *Id*. As such, even when the determinative issue is ordinarily a question of fact for the jury, summary judgment is appropriate if the uncontroverted facts and inferences to be drawn from those facts make it clear that a reasonable person can reach only one conclusion. *White v. Lawrence*, 975 S.W.2d 525, 529-30 (Tenn. 1998).

## IV. DISCUSSION

Defendant contends Plaintiff lacks standing to file a wrongful death action on behalf of Mr. Haynes. Although Plaintiff initiated this appeal from the trial court's grant of summary judgment, we must address the issue of standing first because deciding the case on summary judgment presupposes that Plaintiff had standing to file the action.

### A. Plaintiff's Standing to Initiate a Wrongful Death Action

Standing is the doctrine by which the courts determine whether a particular litigant is entitled to pursue judicial relief as to a particular issue or cause of action. *Am. Civil Liberties Union of Tenn. v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006). Grounded in concern for the proper–and properly limited–role of the courts in a democratic society, the doctrine of standing precludes courts from adjudicating an action at the instance of

one whose rights have not been invaded or infringed. *Id*. (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001)). Persons whose rights or interests have not been affected have no standing and are, therefore, not entitled to judicial relief. *State v. Harrison*, 270 S.W.3d 21, 28 (Tenn. 2008). The sort of distinct and palpable injury that will create standing must be an injury to a recognized legal right or interest. *Id*. Such a legal right or interest may be created or defined by statute. *Id*. "When a statute creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004).

Wrongful death actions are governed purely by statute in Tennessee. At common law, there was no action that survivors could bring for the wrongful death of a relative. *Foster v. Jeffers*, 813 S.W.2d 449, 452 (Tenn. Ct. App. 1991). As a result, it was more economically prudent in some cases to kill a person than to merely inflict a nonfatal injury. *Id*. To negate that moral dilemma, legislatures enacted wrongful death statutes aimed at keeping a decedent's cause of action from dying with the decedent. *Id*. Tennessee's wrongful death statute provides:

> The right of action that a person who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another, would have had against the wrongdoer, in case death had not ensued, shall not abate or be extinguished by the person's death but shall pass to the person's surviving spouse and, in case there is no surviving spouse, to the person's children or next of kin[.]

Tenn. Code Ann. § 20-5-106(a). Notably, the statute does not create any right of action existing independently of that which the decedent would have had, if he or she had survived. *Kline v. Eyrich*, 69 S.W.3d 197, 206-07 (Tenn. 2002). Although the living beneficiaries of the action may seek limited recovery for their own losses in addition to those of the decedent, the right of action itself remains one that is single, entire, and indivisible. *Id*. at 206 (citing *Hill v. Germantown*, 31 S.W.3d 234, 239 (Tenn. 2000); *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 598 (Tenn. 1999)).

Because multiple actions may not be brought to resolve a single wrongful death claim, the wrongful death statutes carefully prescribe the priority of those who may assert the action on behalf of the decedent and his or her other beneficiaries:

> The [wrongful death] action may be instituted by the personal representative of the deceased or by the surviving spouse in the surviving

- 6 -

spouse's own name, or, if there is no surviving spouse, by the children of the deceased or by the next of kin[.]

Tenn. Code Ann. § 20-5-107(a). The statutes governing intestate succession govern priorities among next of kin. *See House v. Gibson*, 827 S.W.2d 310, 311 (Tenn. Ct. App. 1991). Thus, the superior right to bring a wrongful death action falls first to a surviving spouse, then to any children, then to a parent, then to a sibling, then to a grandparent. *See* Tenn. Code Ann. § 31-2-104. An inferior beneficiary may not sue until those persons with a superior right waive their right of action. *Koontz v. Fleming*, 62 S.W.2d 821, 824 (Tenn. Ct. App. 1933). Notably, however, an adult beneficiary may waive his or her superior right to maintain a wrongful death action by permitting an inferior beneficiary's action to stand without objection. *Busby v. Massey*, 686 S.W.2d 60, 62 (Tenn. 1984) (citing *Koontz*, 62 S.W.2d at 824).

In its motion for summary judgment, Defendant argued that Plaintiff lacked standing to institute a wrongful death action on behalf of Mr. Haynes because as many as three other individuals held a superior right to bring such an action. Specifically, Defendant asserted that the whereabouts of Mr. Haynes's biological father were unknown, that Mr. Haynes may have been adopted by his mother's ex-husband, and that Mr. Haynes had a half-brother.[2] The trial court rejected Defendant's argument, noting that an inferior beneficiary may initiate a wrongful death action as long as the other beneficiaries have waived their superior rights to do so.

On appeal, Defendant argues that the trial court's decision was erroneous because Plaintiff did not present any evidence that Mr. Haynes's other beneficiaries waived their superior rights. Defendant's argument suggests that, in bringing a wrongful death action, an inferior beneficiary must affirmatively demonstrate that all individuals who may hold a superior right to file the action have waived it. That is not the case. A beneficiary may impliedly waive his or her superior right to file a wrongful death action by permitting the plaintiff's action to stand without objection. *See Busby*, 686 S.W.2d at 62. Nothing in the record suggests that Mr. Haynes's adoptive father or half-brother have taken any action to maintain control over this action. Furthermore, the statute prescribing the priority of those who may assert a wrongful death action is intended to protect defendants from the expense of defending multiple lawsuits arising from a single injury to a single individual, not to allow defendants to escape liability for a wrongful act. To conclude otherwise would resurrect the very moral dilemma that the wrongful death statutes were enacted to resolve.

---

[2] It is undisputed that Mr. Haynes was not married and did not have any children. It is likewise undisputed that he was predeceased by his mother.

Neither party disputes that, as Mr. Haynes's maternal grandmother, Plaintiff is a person authorized by statute to institute a wrongful death action on his behalf. *See* Tenn. Code Ann. § 20-5-107(a). In the absence of any indication that Mr. Haynes has other beneficiaries who hold a superior right to bring this action and object to her doing so, we conclude that Plaintiff is a proper party with standing in this case.

## B. Plaintiff's Negligence Claim

Having resolved the issue of standing, we now consider the trial court's decision to dismiss Plaintiff's wrongful death action at the summary judgment stage. Plaintiff's wrongful death action is based on a claim for negligence. To prevail on a claim for negligence, a plaintiff must establish the following essential elements: (1) a duty of care owed by the defendant to the plaintiff, (2) conduct falling below the applicable standard of care that amounts to a breach of that duty, (3) an injury or loss, (4) cause in fact, and (5) proximate cause. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). The elements at issue in this case are duty, breach, and proximate cause. We will address each of those elements in turn.

### *Duty*

Whether Defendant's conduct constitutes a breach of duty depends on the nature and scope of its duty of care. Defining the existence and scope of a duty is a question of law to be determined by the court. *Cullum v. McCool*, 432 S.W.3d 829, 832-33 (Tenn. 2013). In its motion for summary judgment, Defendant asserted that it did not owe a duty of care to Mr. Haynes in light of the undisputed fact that he was not in its custody at the time of his suicide. Defendant argued that, because Mr. Haynes was not in its custody at the time, his suicide was an intervening act that relieved it of liability as a matter of law. We, like the trial court, decline to adopt such a broad rule.

Generally, individuals do not have an affirmative duty to act to protect others from dangers or risks except for those that they themselves have created. *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008). The fact that a person realizes or should realize that some action on his or her part is necessary for another's aid or protection does not, by itself, impose on that person a duty to take that action. *Id*. This long-standing principal of tort law, often referred to as the "no duty to act rule" or the "no duty to rescue rule," has been subject to considerable criticism for the harsh results it can produce. *Id*. For example, a passerby on a bridge who cannot be bothered to throw a rope to a person in distress in the waters below may face justifiable societal outrage but no legal liability. *Id*. at 358.

Despite its criticism, Tennessee courts have preserved the no duty to act rule in an effort to prioritize individual liberty over altruism in circumstances where the defendant did not create the risk of harm. *Id.* They have, however, carved out certain exceptions to the no duty to act rule in an effort to mitigate some of its harshest applications. These exceptions arise when the defendant has a special relationship with either the person who is the source of the danger or the person who is foreseeably at risk from the danger. *Id.* at 359 (citing *Biscan v. Brown*, 160 S.W.3d 462, 478 (Tenn. 2005); *Bradshaw v. Daniel*, 854 S.W.2d 865, 871 (Tenn. 1993)). The special relationship creates an affirmative duty to either control the person who is the source of the danger or protect the person who is endangered. *Id.* (citing Restatement (Second) of Torts §§ 314A, 314B, 315). Accordingly, the law provides that while "an actor is always bound to prevent his acts from creating an unreasonable risk to others, he is under the affirmative duty to act to prevent another from sustaining harm only when certain socially recognized relations exist which constitute the basis for such legal duty." *Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997) (quoting *Bradshaw,* 854 S.W.2d at 871).

One class of special relationship that creates an affirmative duty to act is that in which an individual or entity voluntarily takes custody of another under circumstances that deprive the other of his or her normal opportunities for protection. *See Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) (citing Restatement (Second) of Torts § 314A). Tennessee courts have recognized in both prison and psychiatric hospital settings that custodians have an affirmative duty to prevent the occurrence of foreseeable harm to individuals in their custody. *Cockrum v. State*, 843 S.W.2d 433, 436-37 (Tenn. Ct. App. 1992) (citations omitted). As such, the suicide death of an inmate may give rise to a compensable claim for negligence. *Atkinson v. State*, 337 S.W.3d 199, 205 (Tenn. Ct. App. 2010).

Generally, prison officials only have a duty to exercise ordinary and reasonable care for the protection of the persons in their custody. *Id.* (quoting *Cockrum*, 843 S.W.2d at 436). "The scope of this duty does not generally extend to protecting prisoners from self-inflicted injury or death." *Id.* (quoting *Cockrum*, 843 S.W.2d at 436). "However, it can be expanded to include self-inflicted injury or death when the prison officials know or should know that the prisoner might harm himself or herself." *Id.* (quoting *Cockrum*, 843 S.W.2d at 436).

Defendant argues that it did not owe a duty of care to protect Mr. Haynes at the time of his suicide because its special relationship with him ended when he was released. Defendant cites two cases from other jurisdictions in support of its argument: *Coscia v. Town of Pembroke Massachusetts*, 659 F.3d 37 (1st Cir. 2011) and *Clemets v. Heston*, 485 N.E.2d 287 (Ohio Ct. App. 1985). In *Coscia*, the decedent repeatedly threatened to kill himself during his arrest and incarceration. *Coscia*, 659 F.3d at 38. After several

hours of incarceration, he was released on his own recognizance without being examined by a doctor. *Id*. at 39. He committed suicide fourteen hours later. *Id*. The decedent's estate sued the town and police officers, claiming due process violations based on their failure to have the decedent evaluated by medical professionals before releasing him. *Id*. at 38. The court dismissed the claim, explaining that "although the existing law does recognize a custodial duty to take some preventive action, its rationale does not extend official protective responsibility as far as the plaintiff would take it." *Id*. at 40. In *Clemets*, the decedent was arrested for driving while intoxicated. *Clemets*, 485 N.E.2d at 289. During the arrest, the police officer observed a shotgun in plain view on the car seat. *Id*. at 289-90. After issuing a citation, the officer released the decedent, who was apparently still intoxicated, back to his car. *Id*. at 290. Shortly thereafter, the decedent used the shotgun to commit suicide. *Id*. The decedent's estate filed a wrongful death action against the officer, and the court dismissed the claim. *Id*. at 294. In doing so, the court recognized that a special relationship arises when an officer takes custody of an arrestee and the officer has an affirmative duty to protect the arrestee from harm for the duration of that relationship. *Id*. at 291. The court explained, however, that special relationships do not extend indefinitely, and the law does not pose any additional duty on custodial officers to ensure that released prisoners are free from danger in any form. *Id*. at 293. The court concluded that dismissal was appropriate because the complaint did not allege a breach of duty during the special relationship and the officer did not owe any additional duty to the decedent after the special relationship between them ended. *Id*.

Defendant's reliance on *Coscia* and *Clemets* is misplaced because both cases were ultimately resolved on the issue of causation, not the absence of a duty. The court in *Coscia* held that, in the absence of some allegation that the defendants gave rise to or intensified the decedent's suicidal inclination or weakened his instinct for self-preservation, the chain of proximate causation ended with his release. *Coscia*, 659 F.3d at 41. Likewise, the court in *Clemets* recognized that the police officer could be held liable for the decedent's suicide if he negligently released the decedent from custody. *Clemets*, 485 N.E.2d at 292. It simply held that the officer had no reason to anticipate that the decedent would commit suicide immediately after his release and therefore acted reasonably under the circumstances. *Id*. at 293-94.

It is, of course, important to note that Mr. Haynes was no longer in custody at the time of his suicide, but that fact is relevant to the issue of causation, not duty. While special relationships do not extend indefinitely, a breach of duty during the special relationship may give rise to a compensable claim for negligence even though the resulting injury or loss actually occurs after the special relationship has ended. To conclude otherwise would allow prison officials to avoid liability for the foreseeable death of a suicidal inmate by simply releasing the inmate. It might also encourage inmates to feign suicidal ideations in effort to obtain an early release. Obviously, no

- 10 -

reasonable person would endorse such behavior. We therefore conclude that Defendant assumed a duty to protect Mr. Haynes from foreseeable harm when it took him into its custody, regardless of whether he was still in its custody when the harm occurred.

Having concluded that Defendant owed a duty of care to Mr. Haynes, we think it prudent, given the specific facts of the case, to clarify the scope of its duty. Plaintiff contends that Mr. Haynes's suicidal threats conferred on Defendant a heightened duty of care to protect him from self-inflicted harm. She contends that Defendant breached that heightened duty when it prematurely released Mr. Haynes without calling Centerstone for a mental health evaluation or notifying his family of his suicidal threats. Because all of the alleged negligent conduct pertains to Defendant's decision to release Mr. Haynes, our inquiry is limited to determining what duty Defendant owed Mr. Haynes at the time of his release.

Defendant acknowledges that Mr. Haynes's suicidal threats triggered a heightened duty of care to protect him from self-inflicted harm. Defendant contends, however, it was relieved of that heightened duty after Mr. Haynes stated to Officer Sanders that he was just drunk and did not mean his suicidal threats. Defendant argues that it was no longer foreseeable that Mr. Haynes intended to commit suicide at that time, and it therefore only had a duty to exercise ordinary and reasonable care for his protection at that time. Plaintiff, on the other hand, contends that Mr. Haynes's statements to Officer Sanders did not relieve Defendant of its heightened duty because there is a factual dispute regarding Mr. Haynes's sobriety during that conversation. In support of that argument, Plaintiff relies on her own deposition testimony that Mr. Haynes appeared to be intoxicated when she picked him up after his release from Defendant's custody. Plaintiff also points out that Officer Sanders had no formal training in determining the intoxication level of inmates. Plaintiff therefore argues that she, rather than Officer Sanders, would have been more readily able to assess Mr. Haynes's sobriety at the time.

Even viewing the facts and inferences to be drawn from them in the light most favorable to Plaintiff, no rational trier of fact could conclude that Mr. Haynes's suicide was foreseeable to Defendant at the time of his release. Although the suicidal statements Mr. Haynes made when he arrived at the jail triggered Defendant's heightened duty to protect him from self-inflicted harm, it is important to note that Mr. Haynes was highly intoxicated when he made them. Several hours later, Mr. Haynes told Officer Sanders that he was just drunk and did not mean it when he expressed a desire to commit suicide. Officer Sanders testified that Mr. Haynes was joking and did not appear to be intoxicated during that interaction. Although Plaintiff contends that there is a factual dispute regarding Mr. Haynes's sobriety during his conversation with Officer Sanders, the testimony she cites in support of that assertion amounts to little more than speculation:

Q And what made you believe [Mr. Haynes] was intoxicated [when you picked him up after his release]?

A His expression and I could smell the alcohol on him.

Q Well, if he had been drinking the night before, he might still have the smell of alcohol about him, correct?

A Possibly.

Q So, what was it about him that made you think he was still intoxicated?

A Well, it was the timeline. From the time he was picked up and the amount of alcohol he had on him and the time he was released from jail wouldn't be enough to clear alcohol from a person's system.

Q Had [Mr. Haynes's cousin] informed you on how much he had had to drink?

A No. Because today he had to think about it.

. . .

Q Did he tell you it was vodka?

A No. I didn't have any idea what they were drinking, where they were drinking.

Q Okay. And, so, you really didn't know how much he had had to drink either?

A Not at the time, no.

Additionally, Mr. Haynes's cousin, who was also present when Plaintiff picked up Mr. Haynes after his release, testified that Mr. Haynes did not appear to be intoxicated at the time:

Q Okay. When you drove back to Sharyn Haynes's house the next morning, did he appear to be drunk then?

A   He looked really rough.  I don't know whether or not he had blood alcohol content.  From what I could tell, I didn't think he was drunk.  He wasn't like he was when he was arrested.

Q   Was he slurring his speech?

A   Not that I can remember.

. . .

Q   Okay.  But as you sat beside him in the car, were there any of the tell-tale signs that you had seen before that would indicate he was drunk?

A   No.

In any event, the relevant inquiry is not whether Mr. Haynes was actually still intoxicated when he spoke with Officer Sanders.  Rather, it is whether Defendant had any objective reason to foresee that Mr. Haynes might commit suicide following his release from custody.  In our view, it did not.  It is undisputed that Mr. Haynes was intoxicated to the point of passing out when he arrived at the jail.  He vomited in the patrol car and required assistance to walk into the jail.  It was in that highly intoxicated state that he made statements that indicated his desire to commit suicide.  While Plaintiff suggests that Mr. Haynes may have still been intoxicated when he disavowed those statements several hours later, she has not presented any evidence to rebut the testimony of Officer Sanders that, objectively, Mr. Haynes appeared to be fine during their conversation.  Like the trial court, we see no reason, regardless of Mr. Haynes's actual mental state, why Defendant should have given more credence to the statements Mr. Haynes made when he was intoxicated to the point that he could not walk without assistance than it did to those he made when, according to the uncontroverted testimony of Officer Sanders, he seemed fine.  Likewise, despite the fact that Mr. Haynes also stated while intoxicated that he was depressed and had attempted suicide in the past, it was not foreseeable to Defendant that he would commit suicide if he was released in light of his express statement to the contrary approximately six hours later.[3]

---

[3] We think it is worth noting that Plaintiff's own deposition testimony reflects her awareness of the dramatic effect that alcohol could have on Mr. Haynes's demeanor:

A   [H]e got drunk one night and . . . he was talking about running the car head-on into a semi, and evidently got quite drunk at the time.  He was never like that sober.  The only time I ever saw him like that was when he was drunk and he was very drunk.

. . .

For those reasons, we conclude that Defendant's heightened duty to protect Mr. Haynes from self-inflicted harm expired during Mr. Haynes's conversation with Officer Sanders. Because Mr. Haynes expressly disavowed his previous suicidal threats during that conversation, Defendant did not have any reason to anticipate or foresee that Mr. Haynes still had a desire to commit suicide. As such, Defendant only had a duty to exercise ordinary and reasonable care for Mr. Haynes's protection for the remainder of his time in its custody and in releasing him.

### *Breach*

Having established the nature and scope of Defendant's duty of care in releasing Mr. Haynes, we consider now whether Plaintiff has presented evidence from which a rational trier of fact could find that Defendant breached that duty. In doing so, we note that prison officials are not insurers of inmate safety. *Atkinson*, 337 S.W.3d at 205; *Cockrum*, 843 S.W.2d at 438. Their conduct must only be reasonably commensurate with the inmate's known condition at the time. *Atkinson*, 337 S.W.3d at 205; *Cockrum*, 843 S.W.2d at 438. If the allegedly negligent conduct of the prison staff is not clearly improper, expert proof outlining the precise scope of the staff's duty and evaluating the adequacy of the staff's conduct is essential, and the plaintiff cannot recover without it. *Atkinson*, 337 S.W.3d at 205; *Cockrum*, 843 S.W.2d at 438. In our view, it was not clearly improper for Defendant to release Mr. Haynes without calling Centerstone or notifying his family of his suicidal threats in light of our determination that Defendant no longer had a heightened duty to protect him from self-inflicted harm at the time of his release. For that reason, Plaintiff was required to present expert proof to establish a breach of duty in this case.

---

Q   Did you ever sense, you know, the depression?

A   When he was sober, he was always happy and cheerful and, like I said, let's go do something kind of person.

Q   So his demeanor would change –

A   Drastically.

Q   Okay. Drastically between drunk and sober?

A   Yes.

Q   And, so, to your knowledge, it was only on those occasions when he was drunk that he had the depressive thoughts of suicide?

A   As far as I knew, yeah.

- 14 -

Plaintiff submitted the expert witness report of Ron McAndrew in response to Defendant's motion for summary judgment. As it relates to the allegation that Defendant acted negligently by prematurely releasing Mr. Haynes, Mr. McAndrew's report states:

> It is my professional opinion that Mr. Haynes, an extremely intoxicated, underage citizen with stated suicidal threats, without medical referral and/or treatment and without safe transportation, and without continuity of care, was improperly released only a few hours following his book-in at the Wayne County Jail.

As it relates to the allegation that Defendant acted negligently in declining to call Centerstone prior to releasing Mr. Haynes, Mr. McAndrew's report states:

> The jail failed to exercise ordinary care by not calling Centerstone or any other medical professional at the time of these suicidal ideations and at the very least when he woke up the next morning from intoxication.

Mr. McAndrew's report does not contain any opinion related to Defendant's failure to notify Mr. Haynes's family of his suicidal threats.

The opinions set forth in Mr. McAndrew's report are not sufficient to overcome summary judgment. While the courts are not permitted to determine the weight to be given to an expert opinion at the summary judgment stage, the opinion must be based on "trustworthy facts or data sufficient to provide some basis for the opinion." *Church v. Perales*, 39 S.W.3d 149, 166 (Tenn. Ct. App. 2000). An expert opinion lacking such a basis cannot create a genuine dispute of material fact at the summary judgment stage. *Id.* at 167. Here, the facts underlying the opinions set forth in Mr. McAndrew's report are inconsistent with the record. Although Mr. McAndrew's report states that Defendant failed to exercise ordinary care when it declined to call Centerstone at the time of Mr. Haynes's suicidal statements, it is undisputed that Mr. Haynes was highly intoxicated when he made those statements and that Centerstone did not provide services to intoxicated inmates until they were no longer in an intoxicated state. In apparent recognition of that fact, Mr. McAndrew's report states that Defendant should have, at the very least, called Centerstone when Mr. Haynes woke up from his intoxicated state. It is undisputed, however, that Mr. Haynes disavowed his suicidal statements when he woke up from his intoxicated state. As we stated previously, we see no reason why Defendant should have given more credence to the statements Mr. Haynes made when he was intoxicated to the point that he could not walk without assistance than it did to those he made when he, according to the uncontroverted testimony of Officer Sanders, seemed fine. Because it was no longer foreseeable that Mr. Haynes would harm himself, no call to Centerstone was necessary. Likewise, the record does not support the facts underlying

- 15 -

the opinion set forth in Mr. McAndrew's report that Defendant acted improperly in releasing Mr. Haynes. While Mr. McAndrew's report does not provide a specific basis for its assertion that Mr. Haynes's release was "improper," it states that Mr. Haynes was "an extremely intoxicated, underage citizen with stated suicidal threats" at the time. The uncontroverted evidence in the record demonstrates, however, that Mr. Haynes seemed fine at the time of his release, was over the age of majority, and had disavowed his previous suicidal threats. There is no evidence in the record to suggest that Defendant's decision to release Mr. Haynes was otherwise improper.

In any event, Plaintiff only argues on appeal that Defendant's alleged conduct constituted a breach of its heightened duty to protect Mr. Haynes from foreseeable self-inflicted harm. As we explained above, Defendant was only required to exercise ordinary and reasonable care for Mr. Haynes's protection at the time of his release. For that reason, and because the facts underlying the opinions set forth in Mr. McAndrew's report are inconsistent with the uncontroverted evidence in the record, we are satisfied that Plaintiff failed to present evidence sufficient to establish a breach of duty at the summary judgment stage. We therefore conclude that the trial court's grant of summary judgment to Defendant was appropriate.

### Proximate Cause

Despite our conclusion with regard to the element of breach, we also consider whether the record contains evidence from which a rational trier of fact could find that Defendant's conduct was the proximate cause of Mr. Haynes's death. Proximate cause focuses on "whether the policy of the law will extend responsibility for that negligent conduct to the consequences that have occurred." *King v. Anderson Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013). It is the means by which courts put a limit on the causal chain of liability such that, even though the injury would not have happened but for the defendant's conduct, the defendant will not be held liable for injuries that were not substantially caused by or were not a reasonably foreseeable result of their conduct. *Id*. at 246-47. To establish the element of proximate cause in a negligence case, the plaintiff must demonstrate that (1) the defendant's conduct was a "substantial factor" in bringing about the harm complained of, (2) there is no rule or policy that relieves the wrongdoer from liability because of the manner in which the negligence resulted in the harm, and (3) the harm giving rise to the action could have been reasonably foreseen or anticipated by a person of ordinary intelligence. *Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn. 2005).

The evidence in the record conclusively establishes that Defendant's conduct was not a substantial factor in bringing about Mr. Haynes's death. Plaintiff has not alleged or presented any evidence that Defendant intensified Mr. Haynes's depression or desire to commit suicide. Likewise, Plaintiff has not alleged or presented evidence that Defendant weakened Mr. Haynes's desire to live or prevented him from seeking aid on his own after

his release. To the contrary, the record reflects that Defendant provided Mr. Haynes with the contact information for Centerstone when it released him. Thus, it does not appear that Mr. Haynes was released from Defendant's custody in any worse a position than he was when he entered it.

The record also conclusively establishes that Mr. Haynes's suicide was not reasonably foreseeable at the time of his release. No person is expected to protect against harms or events that he or she cannot reasonably anticipate or foresee or that are so unlikely to occur that the risk, although recognizable, would commonly be disregarded. *Rains v. Bend of the River*, 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003). As a general matter, there is much less reason to anticipate intentional misconduct than negligence. *Id*. As such, harm is even less foreseeable when it results from an act of the injured party so obviously fraught with peril that it should deter one of reasonable intelligence. *Id*. (citing *Chattanooga Light & Power Co. v. Hodges*, 70 S.W. 616, 618 (Tenn. 1902)). In this case, the issue of foreseeability hinges on Mr. Haynes's behavior and demeanor at the time Defendant released him without calling Centerstone or notifying his family of his suicidal threats. It is undisputed that Mr. Haynes was not a minor; he was over 18 years old. Officer Sanders testified that Mr. Haynes seemed fine and was even joking and laughing prior to his release. Additionally, Plaintiff and Mr. Haynes's cousin saw Mr. Haynes between his release and the time he committed suicide. Clearly, neither of them suspected that he was suicidal at the time. While liability might have been appropriate if Defendant had released Mr. Haynes with full knowledge that he would commit suicide shortly thereafter, there is no evidence that Mr. Haynes's conduct or demeanor should have given Officer Sanders any reason to foresee or anticipate that he would do so.

Generally, the act of suicide is, as a matter of law, an intervening act that breaks the chain of causation and relieves a negligent actor of liability if the decedent knew and understood the nature of his or her act or the act resulted from a moderately intelligent power of choice. *See White v. Lawrence*, 975 S.W.3d 525, 530 (Tenn. 1998) (citations omitted). In *Lancaster v. Montesi*, the Tennessee Supreme Court sustained the dismissal of a wrongful death action in which the complaint alleged that the defendant had deliberately tormented the decedent and continued to abuse her unmercifully despite the fact that she had attempted to commit suicide the day before and threatened to do so again. 390 S.W.3d 217, 219 (Tenn. 1965). Although the complaint alleged that the decedent was "bereft of reason" at the time of her suicide, the court concluded that it could not be said that she did not know and understand the nature of her act. *Id*. at 222. Later, in a similar case, this Court emphasized that the cause of action in a wrongful death action is that which the decedent would have had if he or she had survived. *Weathers v. Pilkinton*, 754 S.W.2d 75, 78 (Tenn. Ct. App. 1988). Because the decedent would not be able to maintain a cause of action against someone else for his or her

deliberate, calculated, and voluntary act, the decedent cannot pass a cause of action to his or her beneficiaries. *Id.*

While suicide may give rise to a compensable claim for negligence in the custodial setting, it is–as we alluded to previously–relevant to the issue of causation to note that Mr. Haynes was no longer in Defendant's custody when he committed suicide. Defendant's duty to prevent foreseeable harm to Mr. Haynes while he was in its custody was a substitute for the duty that Mr. Haynes would have otherwise borne for himself. In the absence of a clear causal connection, that substitute duty will not support liability against Defendant for harm that occurred to Mr. Haynes after his release. There is no evidence of such a causal connection in this case.

Although no one can know what is going through the mind of a person at the time he or she commits suicide, there is no evidence in the record that Mr. Haynes did not know and understand the nature of his action or that his action did not result from a moderately intelligent power of choice. It is undisputed that Mr. Haynes suffered from depression and had suicidal ideations long before he was taken into Defendant's custody. Mr. Haynes's cousin testified that Mr. Haynes suffered from depression for several years prior to his death and spoke often about committing suicide. Mr. Haynes was, by all accounts, an intelligent adult who, unfortunately, made a voluntary decision to end his own life. In our view, a rational trier of fact could only conclude that Mr. Haynes knew and understood the consequences of that decision. Thus, despite the tragedy that followed his release from Defendant's custody, we find no basis in the record for holding Defendant liable for Mr. Haynes's deliberate, calculated, and voluntary act. We therefore conclude that the trial court's decision to grant Defendant's motion for summary judgment was appropriate.

## V. CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are taxed to the appellant, Sharyn Haynes, and her surety, for which execution may issue if necessary.

_____
ARNOLD B. GOLDIN, JUDGE